1 | **ERICA K. ZUNKEL**
California Bar No. 229285
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, California 92101-5008
Telephone: (619) 234-8467
4 | erica_zunkel@fd.org

Attorneys for Mr. Garcia-Lopez

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

### (HONORABLE LARRY A. BURNS)

| UNITED STATES OF AMERICA, | ) | CASE NO. 08CR0135-LAB |
| | ) | |
| Plaintiff, | ) | DATE: July 23, 2008 |
| | ) | TIME: 2:00 p.m. |
| v. | ) | |
| | ) | |
| **GUILLERMO GARCIA-LOPEZ**, | ) | NOTICE OF MOTIONS AND MOTIONS TO: |
| | ) | |
| Defendant. | ) | 1)   COMPEL DISCOVERY AND PRESERVE EVIDENCE; |
| | ) | 2)   DISMISS INDICTMENT; |
| | ) | 3)   SUPPRESS STATEMENTS; |
| | ) | 4)   DISMISS THE INDICTMENT DUE TO A GRAND JURY VIOLATION; AND, |
| | ) | 5)   GRANT LEAVE TO FILE FURTHER MOTIONS. |

TO:   KAREN P. HEWITT, INTERIM UNITED STATES ATTORNEY; AND
       CHRISTOPHER ALEXANDER, ASSISTANT UNITED STATES ATTORNEY:

PLEASE TAKE NOTICE that on July 23, 2008 at 2:00 p.m., or as soon thereafter as counsel may be heard, defendant, Guillermo Garcia-Lopez, by and through his attorneys, Erica K. Zunkel and Federal Defenders of San Diego, Inc., will ask this Court to enter an order granting the following motions.

/ / /

/ / /

/ / /

# MOTIONS

Defendant, Guillermo Garcia-Lopez, by and through his attorneys, Erica K. Zunkel and Federal Defenders of San Diego, Inc., asks this Court pursuant to the United States Constitution, the Federal Rules of Criminal Procedure, and all other applicable statutes, case law, and local rules for an order to:

(1)    Compel Discovery and Preserve Evidence;

(2)    Dismiss Indictment;

(3)    Suppress Statements;

(4)    Dismiss the Indictment Due to a Grand Jury Violation; and

(5)    Grant Leave to File Further Motions.

These motions are based upon the instant motions and notice of motions, the attached statement of facts and memorandum of points and authorities, the files and records in the above-captioned matter, and any and all other materials that may come to this Court's attention prior to or during the hearing of these motions.

Respectfully submitted,

*s/ Erica K. Zunkel*
**ERICA K. ZUNKEL**
Dated: June 16, 2008
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Garcia-Lopez
erica_zunkel@fd.org

**ERICA K. ZUNKEL**
California Bar No. 229285
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
erica_zunkel@fd.org

Attorneys for Mr. Garcia-Lopez

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE LARRY A. BURNS)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 08CR0135-LAB |
| Plaintiff, | ) | DATE: July 23, 2008 |
| | ) | TIME: 2:00 p.m. |
| v. | ) | |
| **GUILLERMO GARCIA-LOPEZ**, | ) | STATEMENT OF FACTS AND |
| | ) | MEMORANDUM OF POINTS AND |
| | ) | AUTHORITIES IN SUPPORT OF MOTIONS |
| Defendant. | ) | |

**I.**

**STATEMENT OF FACTS**[1]

On December 10, 2007, Mr. Garcia-Lopez was arrested by the Escondido Police Department allegedly for not having a bicycle license and possession of marijuana. Escondido police officers subsequently called Immigration and Customs Enforcement because Mr. Garcia-Lopez told them that he had been deported from the United States in the past. Border Patrol agents responded to the scene and began questioning Mr. Garcia-Lopez about his citizenship, immigration status, and matters likely to incriminate him given the prior arrest and the circumstances. Mr. Garcia-Lopez made statements to the Border Patrol

/ / /

---

1. The following is based primarily upon information supplied through Government discovery. Mr. Garcia-Lopez does not stipulate to its accuracy and reserves the right to challenge it at future proceedings.

08CR0135-LAB

1  agents in response to this questioning.  Mr. Garcia-Lopez subsequently was taken by agents to the Murrieta

2  Border Patrol station.  There, agents read him his <u>Miranda</u> rights and he made statements in response.

3      On January 16, 2008, an indictment was handed down charging Mr. Garcia-Lopez with violating 8

4  U.S.C. §1326 (a) and (b) (deported alien found in the United States).  The indictment was returned by the

5  January 2007 grand jury.  After Mr. Garcia was indicted, previous defense counsel moved for a competency

6  examination pursuant to 18 U.S.C. § 4241.  After a hearing, Magistrate Judge William McCurine ultimately

7  determined Mr. Garcia-Lopez was competent to proceed.

8      These motions follow.

9  **II.**

10  **<u>MOTION TO COMPEL DISCOVERY/PRESERVE EVIDENCE</u>**

11      Mr. Garcia-Lopez moves for the production of the following discovery.  This request is not limited

12  to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the

13  custody, control, care, or knowledge of any "closely related investigative [or other] agencies."  <u>See</u>

14  <u>United States v. Bryan</u>, 868 F.2d 1032 (9th Cir. 1989).

15      To date, ***defense counsel has received 92 pages of discovery***. Mr. Garcia-Lopez respectfully requests

16  that the Government be ordered to produce discovery because Mr. Garcia-Lopez has reason to believe that

17  he has not received all of the discoverable material in his case.  For example, Mr Garcia-Lopez has not

18  received the audio recordings from any of his alleged deportations.  Mr. Garcia-Lopez **specifically requests**

19  **production of a copy of the taped proceedings and any and all documents memorializing the**

20  **deportation proceeding allegedly held and any other proceedings that the Government intends to rely**

21  **upon at trial**.  This request includes discovery of materials known to the Government attorney, as well as

22  discovery of materials which the Government attorney may become aware of through the exercise of due

23  diligence.  <u>See</u> Fed. R. Crim. P. 16.

24      Mr. Garcia-Lopez requests again that the Court order the Government to allow him the opportunity

25  to review his A-file in its entirety.  First, the A-file contains documentation concerning his alleged

26  deportation.  Part of Mr. Garcia-Lopez defense may be that his underlying deportation was invalid.  The

27  documents in the A-file would help illuminate the validity or futility of such a defense.  For example, A-file

28  *///*

1 documents typically contain biographical information.  Such information is essential to determining whether

2 Mr. Garcia-Lopez's deportation was invalid.

3      Second, the Government will likely try to show at trial that a government officer searched the A-file

4 and did not find an application by Mr. Garcia-Lopez for permission to enter the United States.  Mr. Garcia-

5 Lopez anticipates that the Government will attempt to admit a "Certificate of Non-Existence of Record"

6 against him,  arguing that if Mr. Garcia-Lopez had ever applied for permission to enter the United States,

7 such an application would be found in the A-file and because such an application is not in the A-file, Mr.

8 Garcia-Lopez must not have applied for permission to enter the United States.

9      Although the certificate might be admissible, the question of the thoroughness of the search

10 conducted by the Government of the A-file  is, and should be, open to cross-examination.  <u>United States v.</u>

11 <u>Sager</u>, 227 F.3d 1138, 1145 (2000) (error not to allow jury to "grade the investigation.").  Mr. Garcia-Lopez

12 should be able to review his A-file in order to see whether any application for lawful admission exists.

13 Moreover, Mr. Garcia-Lopez should also be able to verify whether other documents that would ordinarily

14 be in the A-file are "non-existent," or otherwise missing from his A-file.  Mr. Garcia-Lopez may assert a

15 defense that his application for lawful entry was lost or otherwise misplaced by the Government.  He must

16 be allowed the opportunity to review his A-file and the manner in which it is being maintained by the

17 Government in order to present this defense.

18      In addition, Mr. Garcia-Lopez moves for the production of the following discovery:

19      1. **Mr. Garcia-Lopez's Statements.**  The Government must disclose to Mr. Garcia-Lopez <u>all</u> copies

20 of any written or recorded statements made by Mr. Garcia-Lopez; the substance of any statements made by

21 Mr. Garcia-Lopez which the Government intends to offer in evidence at trial; any response by Mr. Garcia-

22 Lopez to interrogation; the substance of any oral statements which the Government intends to introduce at

23 trial and any written summaries of Mr. Garcia-Lopez's oral statements contained in the handwritten notes

24 of the Government agent; any response to any <u>Miranda</u> warnings which may have been given to Mr. Garcia-

25 Lopez; as well as any other statements attributed to Mr. Garcia-Lopez.  FED. R. CRIM. P. 16(a)(1)(A).  The

26 Advisory Committee Notes and the 1991 amendments to Rule 16 make clear that the Government must

27 reveal <u>all</u> Mr. Garcia-Lopez's statements, whether written or oral, regardless of whether the Government

28 intends to make any use of those statements.  **Mr. Garcia-Lopez specifically requests all audio and**

1 videotaped copies of his statements and any rough notes taken pertaining to the substance of his

2 statements.  Mr. Garcia-Lopez has not been provided yet with a DVD of his statements to agents on

3 December 10, 2007.

4     2. **Arrest Reports, Notes and Dispatch Tapes.**  Mr. Garcia-Lopez also specifically requests the

5 Government to turn over all arrest reports, notes, dispatch or any other tapes, and TECS records that relate

6 to the circumstances surrounding his arrest or any questioning.  This request includes, but is not limited to,

7 any rough notes, records, reports, transcripts or other documents in which statements of Mr. Garcia-Lopez

8 or any other discoverable material is contained.  Such material is discoverable under FED. R. CRIM. P.

9 16(a)(1)(A) and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  The Government must produce arrest reports,

10 investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution

11 reports pertaining to Mr. Garcia-Lopez.  <u>See</u> FED. R. CRIM. P. 16(a)(1)(B) and (c), FED. R. CRIM. P. 26.2 and

12 12(i).

13     *Mr. Garcia-Lopez specifically requests that the government disclose to him any and all reports,*

14 *notes, dispatch or other tapes relating to his encounter with and arrest by the Escondido Police*

15 *Department on December 10, 2007.  Mr. Garcia-Lopez has not received any information regarding this*

16 *encounter.  It is Mr. Garcia-Lopez's position at this time that his arrest was in violation of the Fourth*

17 *Amendment and that all the fruits of this illegal seizure be suppressed.  <u>See Wong Sun v. United States</u>,*

18 *371 U.S. 471, 487-88 (1963).  Mr. Garcia-Lopez aks for leave to file motions relating to this issue once*

19 *further discovery has been received from the government.*

20     3. **Brady Material**.  Mr. Garcia-Lopez requests all documents, statements, agents' reports, and

21 tangible evidence favorable to Mr. Garcia-Lopez on the issue of guilt and/or which affects the credibility

22 of the Government's witnesses and the Government's case.  Under <u>Brady</u>, impeachment as well as

23 exculpatory evidence falls within the definition of evidence favorable to the accused.  <u>United States v.</u>

24 <u>Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976).

25     4. **Any Information That May Result in a Lower Sentence Under The Guidelines.**

26 Notwithstanding the advisory nature of the sentencing guidelines, the Government must produce this

27 information under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because it is exculpatory and/or mitigating

28 evidence relevant to a possible future determination with respect to sentencing.

1    5. **Mr. Garcia-Lopez's Prior Record.**  Mr. Garcia-Lopez requests disclosure of his prior record.

2  FED. R. CRIM. P. 16(a)(1)(B).

3    6. **Any Proposed 404(b) Evidence.**  Evidence of prior similar acts is discoverable under Fed. R.

4  Crim. P. 16(a)(1)(c) and Fed. R. Evid. 404(b) and 609.  In addition, under Fed. R. Evid. 404(b), "upon

5  request of the accused, the prosecution . . . shall provide reasonable notice in advance of trial . . . of the

6  general nature . . . ." of any evidence the government proposes to introduce under Fed. R. Evid. 404(b) at

7  trial.  Sufficient notice requires the government to "articulate <u>precisely</u> the evidential hypothesis by which

8  a fact of consequence may be inferred from the other acts evidence." <u>United States v. Mehrmanesh</u>, 689 F.2d

9  822, 830 (9th Cir. 1982) (emphasis added; internal citations omitted); <u>see also</u> <u>United States v. Brooke</u>, 4

10  F.3d 1480, 1483 (9th Cir. 1993) (reaffirming <u>Mehrmanesh</u> and reversing convictions).

11    This request includes any "TECS" records as well as any other record(s) of prior border crossings

12  (voluntary entries) that the Government intends to introduce at trial, whether in its case-in-chief, as

13  impeachment, or in its rebuttal case.  Although there is nothing intrinsically improper about prior border

14  crossings (except, as here, where there are allegations of undocumented status), they are nonetheless subject

15  to 404(b), as they are "other acts" evidence that the government must produce before trial.  <u>United States</u>

16  <u>v. Vega</u>, 188 F.3d 1150, 1154-1155 (9th Cir. 1999).

17    The defendant requests that such notice be given three weeks before trial to give the defense time

18  to adequately investigate and prepare for trial.

19    7. **Evidence Seized.**  Mr. Garcia-Lopez requests production of evidence seized as a result of any

20  search, either warrantless or with a warrant.  FED. R. CRIM. P. 16(a)(1)(c).

21    8. **Request for Preservation of Evidence.**  Mr. Garcia-Lopez specifically requests the preservation

22  of all physical evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care

23  of the Government and which relates to the arrest or the events leading to the arrest in this case.  This request

24  includes, but is not limited to, the results of any fingerprint analysis, Mr. Garcia-Lopez's personal effects,

25  and any evidence seized from Mr. Garcia-Lopez.

26    9. **Henthorn Material.**  Mr. Garcia-Lopez requests that the Assistant United States Attorney

27  ("AUSA") assigned to this case oversee (not personally conduct) a review of all personnel files of each agent

28  involved in the present case for impeachment material.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995) (holding

1  that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on

2  the Government's behalf in the case, including the police"); United States v. Henthorn, 931 F.2d 29 (9th Cir.

3  1991); United States v. Jennings, 960 F.2d 1488 (9th Cir. 1992) (AUSA may not be ordered to personally

4  conduct examination of records; appropriate Government agency may review files and notify AUSA of

5  contents as long as AUSA makes the determination regarding material to be disclosed); United States v.

6  Herring, 83 F.3d 1120 (9th Cir. 1996) (accord).

7       10.  **Tangible Objects.**  Mr. Garcia-Lopez requests the opportunity to inspect, copy, and test, as

8  necessary, all other documents and tangible objects, including photographs, books, papers, documents,

9  fingerprint analyses, or copies of portions thereof, which are material to the defense, intended for use in the

10  Government's case-in-chief, or were obtained from or belong to Mr. Garcia-Lopez. FED. R. CRIM. P.

11  16(a)(1)(c). **Specifically, Mr. Garcia-Lopez requests copies of the audio tapes of his alleged prior**

12  **deportations or removals.**

13       11.  **Expert Witnesses.**  Mr. Garcia-Lopez requests the name, qualifications, and a written summary

14  of the testimony of any person that the Government intends to call as an expert witness during its case in

15  chief. FED. R. CRIM. P. 16(a)(1)(E).  The defense requests the notice of expert testimony be provided at a

16  minimum of two weeks prior to trial so that the defense can properly prepare to address and respond to this

17  testimony, including obtaining its own expert and/or investigating the opinions, credentials of the

18  Government's expert and a hearing in advance of trial to determine the admissibility of qualifications of any

19  expert. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999) (trial judge is "gatekeeper" and

20  must determine, reliability and relevancy of expert testimony and such determinations may require "special

21  briefing or other proceedings").

22       12.  **Evidence of Bias or Motive to Lie.**  Mr. Garcia-Lopez requests any evidence that any

23  prospective Government witness is biased or prejudiced against Mr. Garcia-Lopez, or has a motive to falsify

24  or distort his or her testimony.

25       13.  **Impeachment Evidence.**  Mr. Garcia-Lopez requests any evidence that any prospective

26  Government witness has engaged in any criminal act whether or not resulting in a conviction and whether

27  any witness has made a statement favorable to Mr. Garcia-Lopez. See FED. R. EVID. 608, 609 and 613;

28  Brady v. Maryland.

14. **Evidence of Criminal Investigation of Any Government Witness.** Mr. Garcia-Lopez requests any evidence that any prospective witness is under investigation by federal, state or local authorities for any criminal conduct.

15. **Evidence Affecting Perception, Recollection, Ability to Communicate, or Truth Telling.** Mr. Garcia-Lopez requests any evidence, including any medical or psychiatric report or evaluation, that tends to show that any prospective witness' ability to perceive, remember, communicate, or tell the truth is impaired, and any evidence that a witness has ever used narcotics or other controlled substances, or has ever been an alcoholic.

16. **Witness Addresses.** Mr. Garcia-Lopez requests the name and last known address of each prospective Government witness. Mr. Garcia-Lopez also requests the name and last known address of every witness to the crime or crimes charged (or any of the overt acts committed in furtherance thereof) who will not be called as a Government witness.

17. **Name of Witnesses Favorable to Mr. Garcia-Lopez.** Mr. Garcia-Lopez requests the name of any witness who made an arguably favorable statement concerning Mr. Garcia-Lopez or who could not identify him or who was unsure of his identity, or participation in the crime charged.

18. **Statements Relevant to the Defense.** Mr. Garcia-Lopez requests disclosure of any statement relevant to any possible defense or contention that he might assert in his defense.

19. **Jencks Act Material.** Mr. Garcia-Lopez requests production in advance of trial of all material, including dispatch tapes, which the Government must produce pursuant to the Jencks Act, 18 U.S.C. § 3500. Advance production will avoid the possibility of delay at trial to allow Mr. Garcia-Lopez to investigate the Jencks material. A verbal acknowledgment that "rough" notes constitute an accurate account of the witness' interview is sufficient for the report or notes to qualify as a statement under section 3500(e)(1). Campbell v. United States, 373 U.S. 487, 490-92 (1963). In United States v. Boshell, 952 F.2d 1101 (9th Cir. 1991) the Ninth Circuit held that when an agent goes over interview notes with the subject of the interview the notes are then subject to the Jencks Act.

20. **Giglio Information  & Agreements Between the Government and Witnesses.** Pursuant to Giglio v. United States, 405 U.S. 150 (1972), Mr. Garcia-Lopez requests all statements and/or promises,

/ / /

1  express or implied, made to any witness, in exchange for their testimony in this case, and all other

2  information which could be used for impeachment.

3      21. **Agreements Between the Government and Witnesses.**  Mr. Garcia-Lopez requests discovery

4  regarding any express or implicit promise, understanding, offer of immunity, of past, present, or future

5  compensation, or any other kind of agreement, promise, or understanding, including any implicit

6  understanding relating to criminal or civil income tax, forfeiture or fine liability, between any prospective

7  Government witness and the Government (federal, state and/or local).  This request also includes any

8  discussion with a potential witness about or advice concerning any contemplated prosecution, or any

9  possible plea bargain, even if no bargain was made, or the advice not followed, and specifically includes any

10 discussion with a potential witness regarding that witness' immigration status and/or any affect that the

11 witness' statements or lack thereof might have on that status, including the granting or revoking of such

12 immigration status or any other immigration status, including but not limited to citizenship, nationality, a

13 green card, border crossing card, parole letter, or permission to remain in the United States.

14     22. **Informants and Cooperating Witnesses.**  Mr. Garcia-Lopez requests disclosure of the names

15 and addresses of all informants or cooperating witnesses used or to be used in this case, and in particular,

16 disclosure of any informant who was a percipient witness in this case or otherwise participated in the crime

17 charged against Mr. Garcia-Lopez.  The Government must disclose the informant's identity and location,

18 as well as the existence of any other percipient witness unknown or unknowable to the defense.  Roviaro

19 v. United States, 353 U.S. 53, 61-62 (1957).  The Government must disclose any information derived from

20 informants which exculpates or tends to exculpate Mr. Garcia-Lopez.  Brady v. Maryland, 373 U.S. 83

21 (1963)

22     23. **Bias by Informants or Cooperating Witnesses.**  Mr. Garcia-Lopez requests disclosure of any

23 information indicating bias on the part of any informant or cooperating witness.  Giglio v. United States, 405

24 U.S. 150 (1972).  Such information includes, but is not limited to, any inducements, favors, payments or

25 threats that were made to the witness in order to secure cooperation with the authorities.

26     24. **Scientific and Other Information.**  Mr. Garcia-Lopez requests the results of any scientific or

27 other tests or examinations conducted by any Government agency or their subcontractors in connection with

28 this case.  See Rule 16(a)(1)(D).

25. **Residual Request.** Mr. Garcia-Lopez intends by this discovery motion to invoke his rights to discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution and laws of the United States. Mr. Garcia-Lopez requests that the Government provide him and his attorney with the above requested material sufficiently in advance of trial to avoid unnecessary delay prior to cross-examination.

**III.**

**MOTIONS TO DISMISS  THE INDICTMENT**

**A.    Motion to Dismiss The Indictment Because it Fails to Allege All Elements of the Charged Offense.**

The indictment must be dismissed because the government has failed to properly allege all elements of the offense. The Fifth Amendment requires that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ." Consistent with this Constitutional requirement, the Supreme Court has held that an indictment must "<u>fully, directly, and expressly, without any uncertainty or ambiguity</u>, set forth all the elements necessary to constitute the offense intended to be punished." <u>United States v. Carll</u>, 105 U.S. 611, 612-13 (1881) (emphasis added). It is black letter law that an indictment that does not allege an element of an offense, even an implied element, is defective, and should be dismissed. <u>See, e.g.</u>, <u>Russell v. United States</u>, 369 U.S. 749, 769-72 (1962); <u>Stirone v. United States</u>, 361 U.S. 212, 218-19 (1960); <u>United States v. Du Bo</u>, 186 F.3d 1177, 1179 (9th Cir. 1999); <u>United States v. Keith</u>, 605 F.2d 462, 464 (9th Cir. 1979).

In this case, the indictment charges a violation of Title 8, United States Code, Sections 1326(a) and (b). In <u>United States v. Salazar-Lopez</u>, 506 F.3d 748 (9th Cir. 2007), the Ninth Circuit indicated that to be sufficient, an indictment charging a violation of section 1326(b) must allege either that the defendant has been previously removed subsequent to a conviction (*i.e.,* for a misdemeanor, a felony, an aggravated felony, or a crime of violence), or it must allege a specific date of the prior removal. In this case, the indictment only alleges that Mr. Garcia-Lopez "was removed from the United States subsequent to September 17, 1997." The indictment does not allege either that this removal occurred subsequent to a conviction or allege a specific date of the prior removal. Therefore, because the indictment does not allege all elements of section 1326(b), the indictment must be dismissed.

9                    08CR0135-LAB

**B.**    **Dismiss The Indictment Because it Violates Mr. Garcia-Lopez's Right to Presentment.**

As a corollary to the above argument, the indictment should be dismissed because it violates Mr. Garcia-Lopez's right to presentment.  Mr. Garcia-Lopez has a Fifth Amendment right to have a grand jury pass upon those facts necessary to convict him at trial.  In the indictment, the government included the language:  "It is further alleged that defendant GUILLERMO GARCIA-LOPEZ was removed from the United States subsequent to September 17, 1997."[2]  The indictment in this case violates Mr. Garcia-Lopez's right to presentment in two ways.  First, the language added by the government does not ensure that the grand jury actually found probable cause that Mr. Garcia-Lopez was deported after September 17, 1997, as opposed to simply being physically removed from the United States.  Second, that the grand jury found probable cause to believe that Mr. Garcia-Lopez was removed "subsequent to September 17, 1997" does not address the possibility that the government may at trial rely on a deportation that was never presented to, or considered by, the grand jury.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S. Const. Amend. V.  The Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . .."  U.S. Const. Amend. VI.  Thus, a defendant has a constitutional right to have the charges against him presented to a grand jury and to be informed of the grand jury's findings via indictment.  See Russell v. United States, 369 U.S. 749, 763 (1962) (An indictment must "contain[] the elements of the offense intended to be charged, and sufficiently apprise[] the defendant of what he must be prepared to meet.").

To be sufficient, an indictment must allege every element of the charged offense.  See United States v. Morrison, 536 F.2d 286, 287 (9th Cir. 1976) (citing United States v. Debrow, 346 U.S. 374 (1953)).  Indeed, in order to be sufficient, an indictment must include implied elements not present in the statutory

---

Presumably, the government added this language in an attempt to comply with the Ninth Circuit's decision in United States v. Covian-Sandoval, 462 F.3d 1090 (9th Cir. 2006).  In Covian-Sandoval, the Ninth Circuit held that it is an Apprendi violation for a court to increase a person's statutory maximum under 8 U.S.C. § 1326(b) via a court-finding that a person had been removed from the United States following a conviction.  This language, however, does not cure the problems with this indictment.  Should sentencing become necessary, Mr. Garcia-Lopez will file further briefing on this issue.

1    language.  See Du Bo, 186 F.3d at 1179.  "If an element is necessary to convict, it is also necessary to indict,

2    because elements of a crime do not change as criminal proceedings progress."  United States v. Hill, 279

3    F.3d 731, 741 (9th Cir. 2002).  An indictment's failure to "recite an essential element of the charged offense

4    is not a minor or technical flaw . . . but a fatal flaw requiring dismissal of the indictment."  Du Bo, 186 F.3d

5    at 1179.

6         In the indictment, the government here has added the language:   "It is further alleged that defendant

7    GUILLERMO GARCIA-LOPEZ was removed from the United States subsequent to September 17, 1997."

8    There is no indication from this "allegation" that the grand jury was charged with the legal meaning of the

9    word "removal" applicable in this context, as opposed to being simply removed from the United States in

10   a colloquial sense.  It is clear from Covian-Sandoval that in order to trigger the enhanced statutory maximum

11   contained in section 1326(b), the government must prove that a person was removed—as that term is used

12   in the immigration context—after having suffered a conviction. 462 F.3d at 1097-1098 (noting as part of

13   its analysis that immigration proceedings have fewer procedural protections that criminal proceedings).  A

14   deportation has the following elements: "(1) that a deportation proceeding occurred as to [the] defendant and

15   as a result, [(2)] a warrant of deportation was issued and [(3)] executed by the removal of the defendant from

16   the United States."  See United States v. Castillo-Basa, 483 F.3d 890 (9th Cir. 2007) (citing, without

17   contesting, the elements of a deportation provided by the district court).  As this is the type of removal the

18   government must prove before a petite jury, it is necessary that the government allege such a removal before

19   the grand jury.  As returned, however, there is no assurance from the face of the indictment that the grand

20   jury in this case was charged with the type of removal necessary to increase a person's statutory maximum

21   under section 1326(b).

22         As such, there is no fair assurance that the grand jury will have passed upon those facts necessary

23   to convict Mr. Garcia-Lopez.  Additionally, as charged, there is no fair assurance that the indictment will

24   contain those allegations the government will attempt to prove at trial.  If the government alleged before the

25   grand jury that Mr. Garcia-Lopez was removed (in a colloquial sense), but offers proof at trial that Mr.

26   Garcia-Lopez was removed (in an immigration sense), there will be a constructive amendment of the

27   indictment at trial.  See Stirone v. United States, 361 U.S. 212, 217-19 (1960).  Either scenario represents

28   a violation of Mr. Garcia-Lopez's right to presentment.  Stirone, 361 U.S. at 218-19.

1    A second problem with the indictment is that there is no indication which (if any) deportation the

2  government presented to the grand jury.  In most cases, the government will have a choice of deportations

3  to present to the grand jury to support an allegation that a person had been deported after a specific date.

4  According to information provided by the government, although not conceded by the defendant, Mr. Garcia-

5  Lopez has been subjected several  removal proceedings.  This renders it a very real possibility that the

6  government alleged one deportation to the grand jury to sustain its allegation that Mr. Garcia-Lopez was

7  removed from the United States, but will attempt to prove at trial a wholly different deportation to sustain

8  its trial proof.  If this were to turn out to be the case, Mr. Garcia-Lopez's right to have the grand jury pass

9  on all facts necessary to convict him would be violated.  See Du Bo, 186 F.3d 1179.

10                                                                **IV.**

11          **THE COURT MUST SUPPRESS ANY STATEMENTS BY MR. GARCIA-LOPEZ**

12  **A.      The Court Must Suppress Mr. Garcia-Lopez's Alleged Pre-Miranda Statements Because They**
    **Were Elicited as the Result of Custodial Interrogation.**
13

14          The material produced thus far by the government indicates that Border Patrol agents first confronted

15  and interrogated Mr. Garcia-Lopez regarding his citizenship, immigration status, and other incriminatory

16  matters while he was under arrest and in the custody of the Escondido Police Department.  This entire

17  interrogation proceeded any form of administration of Miranda rights by the agents by approximately three

18  hours.

19          "The ruling in Miranda prohibits 'custodial interrogation' unless the government first gives warnings

20  to the [subject of the interrogation]."  United States v. Gonzalez-Sandoval, 894 F.2d 1043, 1046 (9th Cir.

21  1990).  Custodial interrogation occurs when under the totality of the circumstances the questions asked by

22  the police are reasonably likely to elicit an incriminating response from the subject.  Id.  Although questions

23  that include routine biographical information usually do not trigger the safeguard of Miranda v. Arizona,

24  "[t]hat exception is inapplicable . . . where the elicitation of information regarding immigration status is

25  reasonably likely to inculpate the [subject]."  Id.

26  / / /

27  / / /

28  / / /

1    In United States v. Kim, 292 F.3d 971, 973 (9th Cir. 2002),[3] the Ninth Circuit noted that the

2  following factors are to be considered in deciding whether or not a police-dominated atmosphere exists:

3  "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with

4  evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention;  and

5  (5) the degree of pressure applied to detain the individual." Id. (citations omitted); see also United States v.

6  Estrada-Lucas, 651 F.2d 1261, 1265 (9th Cir. 1980) (in context of custody at the border "[t]he factors to be

7  weighed are the language used to summon him, the physical surroundings of the interrogation, the extent

8  to which he is confronted with evidence of his guilt, and the pressure exerted to detain him."). The Ninth

9  Circuit also recognizes that "question[s] implying that [the agent] suspected [the defendant] of criminal

10 activity" can give rise to a reasonable belief that one is not free to ignore the questions and leave.  United

11 States v. Chavez-Valenzuela, 268 F.3d 719, 725 (9th Cir. 2001).[4]

12    It is not necessary that an individual be physically restrained in any fashion. In Beraun-Panez, the

13 Ninth Circuit found that an individual questioned out in an open field, who was neither held nor handcuffed

14 nor told that he was under arrest, was nonetheless in custody for Miranda purposes.  Beraun-Panez held that

15 "[a]lthough not physically bound, Beraun-Panez was subjected to psychological restraints just as binding."

16 812 F.2d at 580.[5]

17    Here, the criteria for a police-dominated atmosphere as articulated in Kim are met. Mr. Garcia-Lopez

18 clearly was in custody when he was questioned by agents.  Border Patrol agents responded to the scene of

19 his custodial arrest precisely because they were asked to conduct an interrogation of Mr. Garcia-Lopez by

20 Escondido police officers.  As stated above, Mr. Garcia-Lopez requests further discovery on Mr. Garcia-

21 / / /

22

23    [3] In Kim, the Ninth Circuit found that a Korean woman who went to her own store, voluntarily,

24 because an officer's visit prompted her to do so was in custody even though she was in familiar surroundings
   because the police "temporarily took over complete control of Kim's store creating a 'police-dominated

25 atmosphere." 292 F.3d at 977.  This combined with difficulty with English and isolation from family
   supported the finding that Kim did not willingly agree to submit to an encounter with the police.  Id.

26

27    [3] Chavez-Valenzuela involved a roadside stop of a motorist on a public street, out in the open.

28    [4] The police confronted Beraun-Panez with his alienage, accused him of lying and kept him
   separated from his co-worker in a remote rural area.  Beraun-Panez, 812 F.2d at 580.

1  Lopez's arrest.  Additional fact-finding in the form of an evidentiary hearing is necessary in this case given

2  the unique circumstances.

3      Concerning the extent to which Mr. Garcia-Lopez was confronted with guilt, he had already been

4  apprehended by Escondido police officers.  It is, however, unclear how long the detention took place or the

5  amount of pressure applied to Mr. Garcia-Lopez since the agent's report does not address how long the

6  interrogation and detention took and only uses boiler-plate language to describe Mr. Garcia-Lopez's

7  responses. Not only did the questioning here occur in a "police-dominated atmosphere," the agent's

8  questioning bore on Mr. Garcia-Lopez's alienage, which is an element of the charged offense, 8 U.S.C.

9  § 1326.  See United States v. Meza-Soria, 935 F.2d 166, 171 (9th Cir. 1991).  This question in such a setting

10  carried with it implicit suspicion of criminal activity. A person, such as Mr. Garcia-Lopez, subjected to such

11  questioning in such a situation obviously does not reasonably feel free to leave, such as in an isolated

12  wilderness area, is thus subject to custodial interrogation. See Chavez-Valenzuela, 268 F.3d 719, 725 (9th

13  Cir. 2001).

14      In the context of an encounter between border patrol and an individual near the international border,

15  any questioning regarding an individual's alienage falls under the rubric of custodial interrogation.

16  Furthermore, because of the close relationship between civil and criminal immigration investigations,

17  "[c]ivil as well as criminal interrogation of in-custody defendants by INS [agents] should generally be

18  accompanied by the Miranda warnings."  United States v. Mata-Abundiz, 717 F.2d 1277, 1279 (9th Cir.

19  1983).

20      Here, it is obvious that the information the agent elicited from Mr. Garcia-Lopez regarding his

21  citizenship and application for permission was "reasonably likely to inculpate" him.  The questions served

22  no purpose other than inculpation. They are in fact two of the four elements that they government must prove

23  to obtain a conviction for a violation of 8 U.S.C. § 1326. Moreover, it is undisputed that Mr. Garcia-Lopez

24  was not read his Miranda rights at that point, nor advised that his answers to the agent's questions could

25  result in federal charges against him. Therefore, statements must be suppressed.

26  ///

27  ///

28  ///

**B.    Mr. Garcia-Lopez Requests a Hearing Pursuant to 18 U.S.C. § 3501 Concerning The Admissibility Of Any Statements That The Government Intends to Use Against Him at Trial.**

This Court should conduct an evidentiary hearing to determine whether any statements made by Mr. Garcia-Lopez's should be admitted into evidence. Under 18 U.S.C. § 3501(a), this Court is required to determine, outside the presence of the jury, whether any statements made by Mr. Garcia-Lopez were voluntarily made. In addition, § 3501(b) requires this Court to consider various enumerated factors, including whether Mr. Garcia-Lopez  understood the nature of the charges against him and whether he understood his rights.

Moreover, section 3501(a) requires this Court to make a factual determination. Where a factual determination is required, courts are obligated to make factual findings by Fed. R. Crim. P. 12. See United States v. Prieto-Villa, 910 F.2d 601, 606-10 (9th Cir. 1990). Because "'suppression hearings are often as important as the trial itself,'" Id. at 610 (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)), these findings should be supported by evidence, not merely an unsubstantiated recitation of purported evidence in a prosecutor's responsive pleadings.

**V.**

**THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS'S INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. GARCIA-LOPEZ OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY**

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury.  That grand jury was instructed by this Court on January 11, 2007.  See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007, a copy of which is attached hereto as Exhibit A.  This Court's instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[6]  These instructions compounded

---

[3] See, e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

1  this Court's erroneous instructions and comments to prospective grand jurors during voir dire of the grand

2  jury panel, which immediately preceded the instructions at Ex. A.  See Reporter's Transcript of Proceedings,

3  dated January 11, 2007, a copy of which is attached hereto as Exhibit B.[7]

> **1.    This Court Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied.**

7  After repeatedly emphasizing to the grand jurors that probable cause determination was their sole

8  responsibility, see Ex. A at 3, 3-4, 5,[8] this Court instructed the grand jurors that they were forbidden "from

9  judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should be a

10 federal law or should not be a federal law designating certain activity [as] criminal is not up to you."  See

11 id. at 8.  The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with

12 that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting

13 even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence

14 may be insufficient.'"  See id. at 8-9.  Thus, the instruction flatly bars the grand jury from declining to indict

15 because the grand jurors disagree with a proposed prosecution.

16 Immediately before limiting the grand jurors' powers in the way just described, this Court referred

17 to an instance in the grand juror selection process in which it excused three potential jurors.  See id. at 8.

> I've gone over this with a couple of people.  You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

20 Id.  That "principle" was this Court's discussion of the grand jurors' inability to give effect to their

21 disagreement with Congress.  See id. at 8-9.  Thus, the Court not only instructed the grand jurors on its view

22 of their discretion; it enforced that view on pain of being excused from service as a grand juror.

23 / / /

24

---

25 [4] The transcript of the voir dire indicates that grand jurors were shown a video presentation on the
26 role of the grand jury.  Mr. Garcia-Lopez requests that the video presentation be produced.  See United
   States v. Alter, 482 F.2d 1016, 1029 n.21 (9th Cir. 1973) ("[t]he proceedings before the grand jury are secret,
27 but the ground rules by which the grand jury conducts those proceedings are not.").

28 [5] See also id. at 20 ("You're all about probable cause.").

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between this Court and various prospective grand jurors, reveals how this Court's emphasis of the singular duty is to determine whether or not probable cause exists and his statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of his earliest substantive remarks, this Court makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, this Court twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that the person that they propose that we indict committed the crime."

Equally revealing is this Court's interactions with two potential grand jurors who indicated that, in some unknown set of circumstances, they might decline to indict even where there was probable cause. Because of the redactions of the grand jurors' names, Mr. Garcia-Lopez will refer to them by occupation. One is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were not an effective use of resources. See id. at 16. The CSW was also troubled by certain unspecified immigration cases. See id.

This Court made no effort to determine what sorts of drug and immigration cases troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling. Rather, this Court provided instructions suggesting that, in any event, any scruples CSW may have possessed were simply not capable of expression in the context of grand jury service.

1
2
3
4
5

> Now, the question is can you fairly evaluate [drug cases and immigration cases]? Just as the defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled to a fair judgment. If there's probable cause, then the case should go forward. *I wouldn't want you to say*, "well, yeah, there's probable cause, but I still don't like what our government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that is your frame of mind, the probably you shouldn't serve. Only you can tell me that.

6 See id. at 16-17 (emphasis added). Thus, without any sort of context whatsoever, this Court let the grand

7 juror know that it would not want him or her to decline to indict in an individual case where the grand juror

8 "[didn't] like what our government is doing," see id. at 17, but in which there was probable cause. See Id.

9 Such a case "should go forward." See id. Given that blanket proscription on grand juror discretion, made

10 manifest by this Court's use of the pronoun "I", the CSW indicated that it "would be difficult to support a

11 charge even if [the CSW] thought the evidence warranted it." See id. Again, this Court's question provided

12 no context; it inquired regarding "a case," a term presumably just as applicable to possession of a small

13 amount of medical marijuana as kilogram quantities of methamphetamine for distribution. Any grand juror

14 listening to this exchange could only conclude that there was *no* case in which this Court would permit them

15 to vote "no bill" in the face of a showing probable cause.

16      Just in case there may have been a grand juror that did not understand his or her inability to exercise

17 anything like prosecutorial discretion, this Court drove the point home in his exchange with REA. REA first

18 advised this Court of a concern regarding the "disparity between state and federal law" regarding "medical

19 marijuana." See id. at 24. This Court first sought to address REA's concerns about medical marijuana by

20 stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

21 account.

22
23
24

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

25 Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, this Court went

26 on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

27 / / /

28 / / /

1    In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id.

2  That disclosure prompted this Court to begin a discussion that ultimately led to an instruction that a grand

3  juror is obligated to vote to indict if there is probable cause.

4      I can tell you sometimes I don't agree with some of the legal decisions that are indicated that
        I have to make.  But my alternative is to vote for someone different, vote for someone that
5      supports the policies I support and get the law changed.  It's not for me to say, "well, I don't
        like it.  So I'm not going to follow it here."

6

7      You'd have a similar obligation as a grand juror even though you might have to grit your
        teeth on some cases.  Philosophically, if you were a member of congress, you'd vote against,
        for example, criminalizing marijuana.  I don't know if that's it, but you'd vote against
8      criminalizing some drugs.

9      That's not what your prerogative is here.  You're prerogative instead is to act like a judge and
        say, "all right.  This is what I've to deal with objectively.  Does it seem to me that a crime
10     was committed?  Yes.  Does it seem to me that this person's involved?  It does." *And then
        your obligation, if you find those to be true, would be to vote in favor of the case going
11     forward.*

12  Id. at 26-27 (emphasis added).  Thus, the grand juror's duty is to conduct a simple two part test, which, if

13  both questions are answered in the affirmative, lead to an "obligation" to indict.

14     Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that

15  paradigm, this Court then set about to ensure that there was no chance of a deviation from the obligation to

16  indict in every case in which there was probable cause.

17     The Court: Do you think you'd be inclined to let people go in drug cases even though you
        were convinced there was probable cause they committed a drug offense?
18     REA: It would depend on the case.
        The Court: Is there a chance that you would do that?
19     REA: Yes.
        The Court: I appreciate your answers.  I'll excuse you at this time.
20

21  Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his

22  political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it

23  should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to

24  indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, this Court

25  made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to

26  hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict

27  ///

28  ///

because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[9]

See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

### 2.    The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.

In addition to his instructions on the authority to choose not to indict, this Court also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[10]

---

[6] This point is underscored by this Court's explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[7] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  This Court advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, this Court affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense to me."  See id. at 43.  See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

This Court's discussion of his once having been a prosecutor before the Grand Jury compounded the error inherent in his praising of the government attorneys.  See Ex. A at 9-10.  This Court's instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, this Court would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while this Court instructed the Grand Jury that it had the power to question witnesses, this Court's instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked."  See Ex. A at 12.  As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors."  Navarro-Vargas, 408 F.3d at 1215.  The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court.  See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

1
2
3
4

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

5    Id. (emphasis added).

6    The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that

7    "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, this Court

8    gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something

9    adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id.

10   Thus, this Court unequivocally advised the grand jurors that the government would present any evidence

11   that was "adverse" or "that cuts against the charge." See id.

12   **B.    Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain the Powers

13         of the Grand Jury, Which This Court Far Exceeded in His Instructions as a Whole During Impanelment.**

14   The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to

15   grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth

16   Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

17   approach[11] to the problems posed by the instructions, endorsed many of the substantive arguments raised

18   by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the

19   grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the

20   January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction

21   of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly

22   unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned.

23   See United States v. Williams, 504 U.S. 36, 49 (1992).

24   / / /

25

26

27   [8] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

28

1    For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas

2  II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in

3  deciding whether a particular prosecution shall be instituted or followed up, performs much the same

4  function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478,

5  510 (1978)).  Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas

6  I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as

7  prosecutorial." ).  See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting).  It recognizes that

8  the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id.,

9  but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted

10  by the prosecutor."  Id.  See Niki Kuckes, The Democratic Prosecutor:  Explaining the Constitutional

11  Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict

12  was "'arguably . . . the most important attribute of grand jury review from the perspective of those who

13  insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal

14  Procedure § 15.2(g) (2d ed. 1999)).

15    Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth

16  in Vasquez v. Hillery, 474 U.S. 254 (1986).  See id.

17    The grand jury thus determines not only whether probable cause exists, but also whether to
      "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps
18    most significant of all, a capital offense or a non-capital offense -- all on the basis of the
      same facts.  And, significantly, the grand jury may refuse to return an indictment even
19    "'where a conviction can be obtained.'"

20  Id. (quoting Vasquez, 474 U.S. at 263).  The Supreme Court has itself reaffirmed Vasquez's description of

21  the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

22  "controls not only the initial decision to indict, but also significant questions such as how many counts to

23  charge and whether to charge a greater or lesser offense, including the important decision whether to charge

24  a capital crime."  Id. at 399 (citing Vasquez, 474 U.S. at 263).  Judge Hawkins notes that the Navarro-Vargas

25  II majority accepts the major premise of Vasquez:  "the majority agrees that a grand jury has the power to

26  refuse to indict someone even when the prosecutor has established probable cause that this individual has

27  committed a crime."  See id. at 1214 (Hawkins, J. dissenting).  Accord Navarro-Vargas I, 367 F.3d at 899

28  (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir. 2002) (per curiam)

1   (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong support in the

2   Ninth Circuit.  But not in this Court's instructions.

3   **C.    This Court's Instructions Forbid the Exercise of Grand Jury Discretion Established in
        Both *Vasquez* and *Navarro-Vargas II*.**

4

5          The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

6   jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

7   decision in Marcucci.  Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

8   every finding of probable cause because the term "should" may mean "what is probable or expected."  299

9   F.3d at 1164 (citation omitted).  That reading of the term "should" makes no sense in context, as Judge

10  Hawkins ably pointed out.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

11  instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

12  obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").  See

13  also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

14  Diction and Language Guide 1579 (1999) (brackets in original)).

15         The debate about what the word "should" means is irrelevant here; the instructions here make no

16  such fine distinction.  The grand jury instructions make it painfully clear that grand jurors simply may not

17  choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

18  disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against

19  indicting even though I think that the evidence is sufficient'...."  See Ex. A at 8-9.  Thus, the instruction

20  flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution.  No

21  grand juror would read this language as instructing, or even allowing, him or her to assess "the need to

22  indict."  Vasquez, 474 U.S. at 264.

23         While this Court used the word "should" instead of "shall" during voir dire with respect to whether

24  an indictment was required if probable cause existed, see Ex. B at 4, 8, in context, it is clear that this Court

25  could only mean "should" in the obligatory sense.  For example, when addressing a prospective juror, this

26  Court not only told the jurors that they "should" indict if there is probable cause, it told them that if there

27  is not probable cause, "then the grand jury should hesitate and not indict."  See id. at 8.  At least in context,

28  it would strain credulity to suggest that this Court was using "should" for the purpose of "leaving room for

1  the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408 F.3d at 1205.

2  Clearly this Court was not.

3      The full passage cited above effectively eliminates any possibility that this Court intended the

4  Navarro-Vargas spin on the word "should."

5      [T]he grand jury is determining really two factors: "do we have a reasonable belief that a
        crime was committed?  And second, do we have a reasonable belief that the person that they
6      propose that we indict committed the crime?"

7      If the answer is "yes" to both of those, then the case should move forward.  If the answer to
        either of the questions is "no," then the grand jury should not hesitate and not indict.

8

9  See Ex. B at 8.  Of the two sentences containing the word "should," the latter of the two essentially states

10 that if there is no probable cause, you *should* not indict.  This Court could not possibly have intended to

11 "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause."  See Navarro-Vargas, 408

12 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159).  That would contravene the grand jury's historic role of

13 protecting the innocent.  See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's

14 "responsibilities continue to include both the determination whether there is probable cause and the

15 protection of citizens against unfounded criminal prosecutions.") (citation omitted).

16     By the same token, if this Court said that "the case should move forward" if there is probable cause,

17 but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see Navarro-

18 Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then this Court would have to have intended

19 two different meanings of the word "should" in the space of two consecutive sentences.  That could not have

20 been his intent.  But even if it were, no grand jury could ever have had that understanding.[12]  Jurors are not

21 presumed to be capable of sorting through internally contradictory instructions.  See generally United States

22 v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court cannot

23 presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

24 / / /

25

26

27     [9] This argument does not turn on Mr. Garcia-Lopez's view that the Navarro-Vargas/Marcucci
   reading of the word "should" in the model instructions is wildly implausible.  Rather, it turns on the context
28 in which the word is employed by this Court in his unique instructions, context which eliminates the
   Navarro-Vargas/Marcucci reading as a possibility.

Lest there be any room for ambiguity, on no less than four occasions, this Court made it explicitly clear to the grand jurors that "should" was not merely suggestive, but obligatory:

**(1)** The first occasion occurred in the following exchange when this Court conducted voir dire and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward. I wouldn't want you to say, "Well, yeah, there's probable cause. But I still don't like what the government is doing. I disagree with these laws, so I'm not going to vote for it to go forward." If that's your frame of mind, then probably you shouldn't serve. Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

See Ex. B at 17. There was nothing ambiguous about the word "should" in this exchange with a prospective juror. Even if the prospective juror did not like what the government was doing in a particular case, that case "should go forward" and this Court expressly disapproved of any vote that might prevent that. See id. ("I wouldn't want you [to vote against such a case]"). The sanction for the possibility of independent judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary deterrence as to the exercise of discretion by any other prospective grand juror.

**(2)** In an even more explicit example of what "should" meant, this Court makes clear that it there is an unbending obligation to indict if there is probable cause. Grand jurors have no other prerogative. Court . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

> You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror

1 responded: "It would depend on the case." Id.  Nevertheless, that juror was excused.  Id. at 28.  Again, in

2 this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and

3 the juror has no prerogative to do anything other than indict if there is probable cause.

4        Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes

5 a particular law to be "unwise."  This juror said that any decision to indict would not depend on the law, but

6 rather it would "depend on the case."  Thus, it is clear that this Court's point was that if a juror could not

7 indict on probable cause for *every* case, then that juror was not fit for service.  It is equally clear that the

8 prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual

9 scenarios, perhaps many.  But this Court did not pursue the question of what factual scenarios troubled the

10 prospective jurors, because his message is that there is no discretion not to indict.

11     **(3)**    As if the preceding examples were not enough, this Court continued to pound the point home

12 that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is

13 that you follow the law that's given to us by the United States Congress.  We enforce the federal laws here."

14 See id. at 61.

15     **(4)**    And then again, after swearing in all the grand jurors who had already agreed to indict in

16 every case where there was probable cause, this Court reiterated that "should" means "shall" when it

17 reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think

18 that the evidence is sufficient . . . .  Instead your *obligation* is . . . not to bring your personal definition of

19 what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at 9.

20        Moreover, this Court advised the grand jurors that the were forbidden from considering the penalties

21 to which indicted persons may be subject.

22     Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
    about because there is a disparity between state and federal law.

23     The Court:  In what regard?
    Prospective Juror: Specifically, medical marijuana.

24     The Court:  Well, those things -- the consequences of your determination shouldn't concern
    you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*

25     *that they cannot consider the punishment or the consequence that Congress has set for these*
    *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision

26     of whether there was a probable cause. ...

27 See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

28 would obviously leave no role for the consideration of penalty information.

The Ninth Circuit previously rejected a claim based upon the proscription against consideration of penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for two reasons.  First, this Court did not use the term "should" in the passage quoted above.  Second, that context, as well as his consistent use of a mandatory meaning in employing the term, eliminate the ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez, which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

Noting can mask the undeniable fact that this Court explicitly instructed the jurors time and time again that they had a duty, an obligation, and a singular prerogative to indict each and every case where there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court held in Vasquez:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.  Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be obtained."

474 U.S. at 263 (quoting United States v. Ciambrone, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J., dissenting)); accord Campbell v. Louisiana, 523 U.S. 392, 399 (1998) (The grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").  Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to indict."  See id. at 264.  This Court's grand jury is not Vasquez's grand jury.  The instructions therefore represent structural constitutional error "that interferes with the grand jury's independence and the integrity of the grand jury proceeding."  See United States v. Isgro, 974 F.2d 1091, 1094 (9th Cir. 1992).  The indictment must therefore be dismissed.  Id.

The Navarro-Vargas II majority's faith in the structure of the grand jury *is not* a cure for the instructions excesses.  The Navarro-Vargas II majority attributes "[t]he grand jury's discretion -- its

1  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

2  decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

3  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

4  independent."  Id. at 1202 (emphases in the original).

5      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

6  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

7  of many of its decisions -- sufficiently protects that power."  See id. at 1214 (Hawkins, J., dissenting).  The

8  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

9  making a probable cause determination ... unconstitutionally undermines the very structural protections that

10 the majority believes save[] the instruction."  Id.  After all, it is an "'almost invariable assumption of the law

11 that jurors follow their instructions.'"  Id. (quoting Richardson v. Marsh, 481 U.S. 200, 206 (1987)).  If that

12 "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

13 in Vasquez.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

14 erroneous instructions because nothing will happen if they disobey them."  Id.

15     In setting forth Judge Hawkins' views, Mr. Garcia-Lopez understands that this Court may not adopt

16 them solely because the reasoning that supports them is so much more persuasive than the majority's

17 sophistry.  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

18     Here, again, the question is not an obscure interpretation of the word "should", especially in light

19 of the instructions and commentary by this Court during voir dire discussed above - unaccounted for by the

20 Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on

21 the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell,

22 and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

23     This Court did not limit itself to denying the grand jurors the power that Vasquez plainly states they

24 enjoy.  He also excused prospective grand jurors who might have exercised that Fifth Amendment

25 prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...."  See

26 Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot

27 embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the

28 conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a

1  grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches

2  of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d

3  1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on

4  their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and,

5  here, this Court has both fashioned his own rules and enforced them.

6  **D.    The Instructions Conflict with Williams' Holding That There Is No Duty to Present**
   **Exculpatory Evidence to the Grand Jury.**

7

8         In Williams, the defendant, although conceding that it was not required by the Fifth Amendment,

9  argued that the federal courts should exercise their supervisory power to order prosecutors to disclose

10 exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment

11 common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory'

12 judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority

13 "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct

14 amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this

15 Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it

16 does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id.

17 at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

18 initiative, rules of grand jury procedure."  Id. at 50.  As a consequence, Williams rejected the defendant's

19 claim, both as an exercise of supervisory power and as Fifth Amendment common law.  See id. at 51-55.

20        Despite the holding in Williams, the instructions here assure the grand jurors that prosecutors would

21 present to them evidence that tended to undercut probable cause.  See Ex. A at 20.

22        Now, again, this emphasizes the difference between the function of the grand jury and the
          trial jury.  You're all about probable cause.  If you think that there's evidence out there that
23        might cause you say "well, I don't think probable cause exists," then it's incumbent upon you
          to hear that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-*
24        *bound to present evidence that cuts against what they may be asking you to do if they're*
          *aware of that evidence.*
25

26 Id. (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

27 duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

28 [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  See

1  id. at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  See

2  Navarro-Vargas, 408 F.3d at 1207.

3        This particular instruction has a devastating effect on the grand jury's protective powers, particularly

4  if it is not true.  It begins by emphasizing the message that Navarro-Vargas II somehow concluded was not

5  conveyed by the previous instruction: "You're all about probable cause."  See Ex. A at 20.  Thus, once again,

6  the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

7  probably unnecessary in light of the fact that this Court had already told the grand jurors that they likely

8  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

9  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

10 will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

11 cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

12 instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

13 you to do if they're aware of that evidence."  See id.  Moreover, during voir dire, this Court informed the

14 jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

15 that cuts against the charge, you'll be informed of that. *They have a duty to do that*."  See Ex. B at 14-15

16 (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

17 the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

18 in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented

19 to you."  See Ex. A at 27.

20       These instructions create a presumption that, in cases where the prosecutor does not present

21 exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in a case in which no

22 exculpatory evidence was presented, would proceed along these lines:

> (1)   I have to consider evidence that undercuts probable cause.
> (2)   The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
> (3)   Because no such evidence was presented to me, I may conclude that there is none.

26 Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the

27 evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-

28 bound prosecutor would have presented it.

1  The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the

2  prosecutor would present it, so investigation is a waste of time -- and provide additional support to every

3  probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side

4  of the equation because it was not presented.  A grand jury so badly misguided is no grand jury at all under

5  the Fifth Amendment.

6  **VI.**

7  **MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS**

8  Discovery is not complete.  Mr. Garcia-Lopez contemplates further motions -- in particular a motion

9  regarding the validity of the deportation and the validity of Mr. Garcia-Lopez's arrest by Escondido police

10  officers -- once discovery is received and reviewed with Mr. Garcia-Lopez.  Defense counsel has not

11  received adequate discovery at this juncture to file these motions at this time.  Therefore, counsel requests

12  leave to file additional motions once discovery is completed.

13  **VII.**

14  **CONCLUSION**

15  For the foregoing reasons, Mr. Garcia-Lopez respectfully requests that the Court grant the above

16  motions.

17  Respectfully submitted,

18

19  Dated: June 16, 2008

*s/ Erica K. Zunkel*

**ERICA K. ZUNKEL**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Garcia-Lopez
erica_zunkel@fd.org

20

21

22

23

24

25

26

27

28

1 | **ERICA K. ZUNKEL**
California State Bar No. 229285
2 | **FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
3 | San Diego, CA 92101-5008
(619) 234-8467/Fax: (619) 687-2666
4 | E-Mail: erica_zunkel@fd.org

5 | Attorneys for Guillermo Garcia-Lopez

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10 | **(HONORABLE LARRY A. BURNS)**

11 | UNITED STATES OF AMERICA,                )    Case No. 08CR0135-LAB
                                              )
12 |                  Plaintiff,               )
                                              )
13 | v.                                        )    **CERTIFICATE OF SERVICE**
                                              )
14 | GUILLERMO GARCIA-LOPEZ,                    )
                                              )
15 |                  Defendant.               )
    _____)

16

17 |         Counsel for Defendant certifies that the foregoing pleading is true and accurate to the best of her

18 | information and belief, and that a copy of the foregoing document has been served this day upon:

19 | Christopher Michael Alexander
Christopher.M.Alexander@usdoj.gov,maria.richardson@usdoj.gov,efile.dkt.gc1@usdoj.gov
20

21 |                                              Respectfully submitted,

22

23 | DATED:        June 16, 2008                   /s/ Erica K. Zunkel
                                              **ERICA K. ZUNKEL**
24 |                                           Federal Defenders of San Diego, Inc.
                                              Attorneys for Guillermo Garcia-Lopez
25

26

27

28